IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Maryland)

**PAMELA SCOTT, INDIVIDUALLY and as**                    *
**Personal Representative of**
**THE ESTATE OF TROY ANTHONY SCOTT, JR.**               *
3203 Evergreen Avenue
Baltimore, MD 21214                                       *

**TROY ANTHONY SCOTT, SR.**                              *
3203 Evergreen Avenue
Baltimore, MD 21214                                       *

**LATOYA MOORE, Mother and**                             *
**Next Friend of K.A**
**Minor Child of Troy Anthony Scott, Jr.**               *
3029 Mayfield Avenue
Baltimore, MD 21213                                       *

**WYKETA BURGESS, Mother and**                           *
**Next Friend of T.S., III and T.S**
**Minor Children of Troy Anthony Scott, Jr.**            *
6239 Parallel Lane
Columbia, MD 21045                                        *

    and                                *

**CHE'TARA BELL, Mother and**                            *
**Next Friend of U.S.**
**Minor Child of Troy Anthony Scott, Jr.**               *
405 East 27th Street
Baltimore, MD 21218                                       *

    **v.**                             *

**WEXFORD HEALTH SOURCES, INC.**                         *
381 Mansfield Avenue, Suite 205
Pittsburgh, Pennsylvania 15220                            *

    SERVE ON:  CSC – Lawyers Incorporating    *
            Service Company
            7 St. Paul Street, Suite 1660   *
            Baltimore, MD 21202

                  *     Civil Action No.:

    and

                                       *

**RAYLENE SAGE, R.N.**
7800 House of Corrections Road          *
Jessup, MD 20791
\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT AND JURY TRIAL REQUEST

NOW COME the Plaintiffs Pamela Scott, Individually and as Personal Representative of the Estate of Troy Anthony Scott, Jr.; Troy Anthony Scott, Sr.; Latoya Moore, mother and next friend of minor K.S.; Wyketa Burgess, mother and next friend of minors T.S., III and T.S.; and Che'tara Bell, mother and next friend of U.S., by and through their undersigned counsel, who hereby sue Defendants Raylene Sage, R.N. and Wexford Health Sources, Inc., and state as follows:

### Jurisdiction & Venue

1.   The causes of action advanced herein involve allegations of medical negligence and deliberate indifference to known medical necessity in connection with medical care rendered at the Maryland Correctional Institute at Jessup (hereinafter "MCI-J").

2.   Venue is proper in this Honorable Court as the subject events occurred in Anne Arundel County, Maryland.

3.   This action includes a claims for monetary damages brought pursuant to 42 U.S.C. §1983, 42 U.S.C. § 1988, and the Eight Amendment of the United States Constitution. Jurisdiction accordingly attaches under 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this court to entertain claims arising under Maryland State law.

4.   MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §§ 3-2A-01, *et seq.* "The Health Care Malpractice Claims Act," applies to actions seeking more than $5,000.00 in damages from a health care provider for a medical injury. The Act requires that such actions be filed with the Maryland Health Claims Alternative Dispute Resolution Office before the

2

initiation of a civil action. *See id.* §§ 3-2A-02(a)(2) and 3-2A-04(a)(1); *see also Tranen v. Aziz*, 304 Md. 605, 612 (1985). Plaintiffs satisfied this condition precedent when they initiated the Claim styled *Estate of Troy Anthony Scott v. Wexford, et al.*, HCADRO No.: 2016-263, on May 23, 2016. Within that Claim, Plaintiffs generally asserted that Defendant Wexford and its agents, including Defendant Nurse Raylene Sage, deviated from the controlling standard of care during the provision of medical treatment to Decedent Troy Scott. The Claim was submitted to HCADRO in conjunction with a Certificate of Merit authored by David Hager, M.D., a licensed physician Board Certified in Emergency Medicine. Defendant Raylene Sage answered the Claim on July 8, 2016, and Wexford answered the Claim on August 3, 2016. In advance of filing the instant Complaint and Jury Trial Demand, Plaintiffs waived arbitration in the HCADRO; a copy of the date stamped waiver is attached hereto as Appendix A. The named defendants hereto had not acted to field a Certificate of Meritorious defense prior to the waiver.

## **Parties**

5.   Decedent Troy Anthony Scott, Jr. (hereinafter "Decedent Scott" or "Mr. Scott") was born on August 8, 1980. Mr. Scott passed away on May 23, 2013. The Estate of Anthony Scott, Jr. was opened by the Register of Wills for Baltimore City on July 8, 2013, and Pamela Scott, 3203 Evergreen Avenue, Baltimore, MD 21214, was appointed as the Personal Representative for the same.

6.   Decedent Scott is survived by his mother, Plaintiff Pamela Scott, who is both a primary beneficiary in this action pursuant to MARYLAND ANNOTATED CODE, *Courts and Judicial Procedures Article* § 3-904(a) and has also been appointed Personal Representative of the Estate of Troy Anthony Scott, Jr. Plaintiff Pamela Scott is a citizen of the State of Maryland with a primary address of 3203 Evergreen Avenue, Baltimore, MD 21214.

7.   Decedent Scott is survived by his father, Plaintiff Troy Anthony Scott, Sr. who is a primary beneficiary in this action pursuant to MARYLAND ANNOTATED CODE, *Courts and Judicial Procedures Article* § 3-904(a). Plaintiff Troy Anthony Scott, Sr. is a citizen of the State of Maryland with a primary address of 3203 Evergreen Avenue, Baltimore, MD 21214.

8.   Decedent Scott is survived by the Minor Plaintiff K.S., child of Decedent Scott and Latoya Moore, who is as primary beneficiary pursuant to MARYLAND ANNOTATED CODE, *Courts and Judicial Procedures Article* § 3-904(a). Prior to incidents giving rise to the instant suit, Decedent Scott openly recognized Minor Plaintiff K.S. as his child. Minor Plaintiff K.S. resides with her mother Latoya Moore and maintains a principal address of 3029 Mayfield Avenue, Baltimore, MD 21213.

9.   Decedent Scott is survived by the Minor Plaintiffs T.S. and T.S., III, infant children of Decedent Scott and Wyketa Burgess, who are primary beneficiaries in this action pursuant to MARYLAND ANNOTATED CODE, *Courts and Judicial Procedures Article* § 3-904(a). Prior to the incidents giving rise to the instant suit, Decedent Scott openly recognized Minor Plaintiffs T.S. and T.S., III as his children. Minor Plaintiffs T.S. and T.S., III reside with their mother Wyketa Burgess and maintain a principal address of 6239 Parallel Lane, Columbia, MD 21045.

10. Decedent Scott is survived by the Minor Plaintiff U.S., infant child of Decedent Scott and Che'Tara Bell, who is as primary beneficiary in this action pursuant to MARYLAND ANNOTATED CODE, *Courts and Judicial Procedures Article* § 3-904(a). Prior to the incidents giving rise to the instant suit, Decedent Scott openly recognized Minor Plaintiff U.S. as his child. Minor Plaintiff U.S. resides with her mother Che'Tara Bell and maintains principal address of 405 East 27th Street, Baltimore, MD 21218.

11.  Defendant Wexford Health Sources, Inc. (hereinafter "Wexford") is a business entity formed under Florida law with a principal business address at 425 Holiday Drive, Foster Plaza Two, Pittsburgh, Pennsylvania 15220. On or about May 16, 2012, Wexford entered a contract with the State of Maryland and thereby assumed responsibility for the medical care and treatment of inmates housed throughout the state including those housed at the Maryland Correctional Institute- Jessup ("MCI-J"). Defendant Wexford has availed itself of the privilege of conducting business within the State of Maryland such that it is not unreasonable to require Defendant Wexford Health Sources, Inc. to submit to the burden of litigation within the State of Maryland.

12. At all times relevant to this Complaint, Defendant Raylene Sage, R.N. (hereinafter "Sage") provided medical services at MCI-J and was an agent, servant, and/or employee of Wexford. Defendant Sage is named individually and in support of respondeat superior liability against Defendant Wexford.

13. The Supreme Court has long recognized that private physicians and nurses who contract with the State to provide medical care to prisoners act "under color of law" for purposes of § 1983. *See, e.g., West v. Atkins,* 487 U.S. 42 (1988).  At all times relevant to this suit, Defendant Sage and Defendant Wexford were acting under the color of law and they are accordingly sued in this case both independently and in their respective official capacities.

## Facts Common to All Counts

14. The instant matter concerns conduct by Defendants Sage and Wexford that occurred while Decedent Troy Scott, Jr. was incarcerated at MCI-J. At all times relevant to this Complaint, Decedent Scott was in the custody of, and subject to controls and limitations imposed by, the Maryland Department of Public Safety and Correctional Services (hereinafter "DPSCS"). Decedent Scott was scheduled to be released from custody in the middle portion of June 2013.

5

15. At all times relevant to this Complaint, Defendants Sage and Wexford were contractually obligated and otherwise duty bound to provide adequate, reasonable, and necessary medical care to inmates housed at MCI-J including Decedent Scott.

16. At all times relevant to this action, Defendants Sage and Wexford had actual knowledge that Decedent Scott was a diagnosed asthmatic and that Decedent Scott had historically suffered acute asthma attacks necessitating emergent healthcare.

17. Pursuant to certain directives imposed by the State of Maryland, Defendant Wexford was required to maintain and utilize computerized health records concerning the provision of health care to inmates in the custody of the DPSCS. These computerized health care records included reports, notes, labs, etc. from any DPSCS facility where an inmate may have been housed and concerning any period of time when an inmate was incarcerated (including distinct and non-consecutive periods of incarceration). The records also included entries that were made by the medical provider that had preceded Defendant Wexford's contract with the State of Maryland. The computerized health records were available to all healthcare providers who might have occasion to encounter an inmate such as, and including, Decedent Scott.

18. Decedent Scott's computerized heath records indicate that he was treated in a "Chronic Care" capacity in connection with a history of asthma from 2009 until he was released from DPSCS custody in approximately March of 2011, and then again when he was returned to DPSCS custody in February of 2012 until the time of his death.

19. At all times relevant to this complaint, the State of Maryland had in place, issued, and/or otherwise promulgated policies and procedures applicable to contracted medical providers including Defendant Wexford and its agents, servants, and/or employees.

20. A portion of the State of Maryland's controlling policies and procedures directly concerned asthmatic inmates.

21. At all times relevant to this action, all inmates suffering from Asthma were required to be, among other things, enrolled in Chronic Care Clinics, treated in accordance with national and community guidelines, and to undergo routine Peak Expiratory Flow Rate ("PEF" or "PEFR") measurements/testing.

22. At all times relevant to this action, nurse practitioners working at MCI-J, including Defendant Sage, were on notice of a requirement and/or understood that they were required to refer inmates to a physician if (1) PEFR was measured at less than 300 liters, (2) there had been a 20% or greater reduction of the PEFR from an established baseline, or (3) where evidence existed from a provided history or physical examination that asthma was poorly controlled.

23. At all times relevant to this action, Defendant Wexford and its agents, servants, and/or employees including Defendant Sage were on notice of a requirement and/or understood that they were required to immediately transfer asthmatic inmates to a hospital emergency room if, among other things, (1) the inmate was identified as having a PEFR measurement of 50% or less than an established baseline or (2) the inmate was unable to perform peak flow testing.

24. Decedent Scott's baseline PEFR was established and known to Defendant Wexford and Defendant Sage, as well as, their respective agents, servants, and/or employees by way of the computerized medical records concerning Decedent Scott.  Said records evidence that on January 6, 2009, Decedent Scott's PEFR was charted as 500 on each of the 3 required attempts;  on April 8, 2010, Decedent Scott's average PEFR was charted as 500;  on April 8, 2010, Decedent Scott's average PEFR was charted as 680; on February 7, 2012, Decedent Scott's average PEFR was charted as 600; on March 23, 2012, Decedent Scott's average PEFR was charted as 600; on May

16, 2012, Decedent Scott's average PEFR was charted as 450; on September 10, 2012, Decedent Scott's average PEFR was charted as 520; on November 12, 2012, Decedent Scott's average PEFR was charted as 545; and on May 6, 2013, Decedent Scott's average PEFR was charted as 700.

25. On November 12, 2012, Decedent Scott was examined by Yonas Sisay, M.D., a Wexford employee, in the "Chronic Care Clinic" at MCI-J. Dr. Sisay identified Decedent Scott as 32 year-old black male with a history of chronic asthma dating to childhood. This information was contemporaneously entered into the computerized medical records maintained by Defendant Wexford and was subsequently available to any agent, servant, and/or employee of Defendant Wexford that might have occasion to encounter Decedent Scott. During the course of the same examination, Decedent Scott's vital signs were charted as follows: blood pressure 152/104, pulse 91, and respiration 16. Peak expiratory flow measurements were recorded at 545.  Mr. Scott's prescribed medications were identified as Proventil Hfa 90 mcg, Zestril 30 mg, and Hydrochlorothiazide 25 mg.

26. On February 12, 2013, Decedent Scott was examined by Dr. Sisay in the Chronic Care Clinic at MCI-J. Dr. Sisay documented the reason for the visit as asthma and hypertension. The corresponding physical examination was charted in computerized health records as essentially normal and there were no medication changes.

27. On May 6, 2013, Decedent Scott was examined by Dr. Sisay in a Chronic Care Clinic at MCI-J. Dr. Sisay documented the reason for the visit as asthma with wheezing 3x/month, as well as hypertension. PEFR measurements were recorded as averaging 700. There were no medication changes.

28. On May 23, 2013, Decedent Scott reported to the health unit at 4:35 a.m. where he encountered Defendant Sage, and was evaluated by Defendant Sage on behalf of Defendant Wexford.  Defendant Sage had access to a complete copy of Decedent Scott's computerized medical records at the time of this encounter.

29. Defendant Sage completed a computerized chart entry concerning her May 23, 2013 encounter with Decedent Scott. She documented Decedent Scott's "subjective" reports of a "previous history" of respiratory problems; her observations that Decedent Scott was "sweating and stated he was anxciouis [sic]"; and her finding upon limited physical examination to include blood pressure 150/80, pulse 125, respiration 24, pulse oxygen measured at 94%, and "bilateral wheezing."  Defendant Sage also documented Decedent Scott's report that he was "unable to do peak flow" testing at the time of his arrival in the health unit and that he had "asked for oxygen."

30. The report corresponding with Decedent Scott's initial encounter with Defendant Sage constitutes objective proof that he was diaphoretic, hypoxic, and suffering from a serious and potentially fatal asthma attack when he presented at 4:35 a.m.

31. At the time of Decedent Scott's presentation on May 23, 2013, Defendant Sage had actual knowledge and subjectively understood that that he was suffering from an acute asthma attack, that he was in distress, and having extreme difficulty breathing (as evidenced by his inability to perform the requested PEF testing and request for oxygen), and that he was in need of prompt medical attention. Defendant Sage knew that Decedent Scott was at risk of further injury and death in the absence of medical treatment. Defendant Sage's subjective understanding is evidenced by, among other things: (1) her limited physical examination of Decedent Scott; (2) her decision to administer "an albuterol neb[ulizer] treatment"; (3) her continuing observation of

Decedent Scott for approximately 90 minutes; and (4) her indication that Mr. Scott "was told if symptoms returned to have officers call and bring him back to the health unit to be evaluated."

32. At the time of Decedent Scott's presentation on May 23, 2013, Defendant Wexford had imputed knowledge and subjectively understood that that Decedent Scott was suffering from an acute asthma attack, that Decedent Scott was in distress and having trouble breathing (as evidenced by his inability to perform the requested PEF and request for oxygen) and that he was in need of prompt medical attention by way of the computerized medical record.

33. This limited medical treatment provided to Decedent Scott, by Defendants Wexford and Sage, violated policies and procedures applicable to asthmatic inmates, and was also inconsistent with community and national standards applicable to the treatment of asthmatic patients.

34. Given Decedent Scott's inability to perform peak flow testing at the time of his initial presentation to Defendant Sage on May 23, 2013, policy, procedure, and controlling standards of care required that he be immediately referred to a physician and/or transferred to an outside hospital emergency department.

35. Defendant Sage did not make a physician referral nor did she undertake efforts to have Decedent Scott transferred to a hospital.

36. Defendant Sage also did not conduct or request a complete respiratory/pulmonary examination, verify that Decedent Scott received the oxygen that he had requested, and/or chart serial vital signs for purposes of evaluating his health status.

37. At approximately 6:00 a.m., Decedent Scott was discharged from the health unit by Defendant Sage. At that time of this occurrence, Decedent Scott was still suffering from an acute asthma attack necessitating continuing medical care and exhibiting the signs and symptoms of such an illness including difficulty breathing. Defendant Sage documented Decedent Scott's

condition at the time of departure as follows: "When he left at appox 0600 his lungs wear [sic] clear; pulse ox 97%; peak flows remained low 170/200 and [Decedent Scott] stated he couldn't do #3 [peak flow test]. He was added to MD chronic care list for today."

38. Defendant Sage had actual knowledge, as evidenced by the PEFR test results and her corresponding commentary that PEFR "remained low," that the administered nebulizer treatment had not been effective as there was continuing symptomology indicative of airway narrowing.

39. Defendant Sage also had actual notice, as evidenced by the material contained in her charting, that Decedent Scott was having difficulty breathing secondary to his ongoing acute asthma attack and required follow up medical care with a physician.

40. Because Decedent Scott's charted PEFR of 170 on the first attempt and 200 were both less than 300 liters and also represented a reduction of greater than 20% of an established baseline of PEFR, the standard of care and controlling policy required and immediate physician referral and/or that Decedent Scott be maintained in the health unit for continuing observation.

41. Because (1) Decedent Scott's charted PEFR of 170 on the first attempt and 200 represented a reduction of greater than 50% of an established baseline of PEFR and (2) Decedent Scott was unable to perform the final component of PEFR measurement, the standard of care and controlling policy mandated that he be immediately referred to an outside emergency room at the time that he was released from the health unit.

42. At the time of his discharge from the health unit, Decedent Scott's charted PEFR fell within the American Lung Association's definition of "Red Zone" readings at 50% or less of "normal" peak flow rate for any individual which signals a "Medical Alert." This data, alone or in conjunction with Decedent Scott's inability to perform the third effort of PEFR testing, was indicative of severe airway narrowing.

43. The controlling standard of care required that immediate medical decisions and treatment be initiated in response to Decedent Scott's documented PEFR at the time of his discharge from the health unit.

44. Defendant Sage failed to make such decisions and/or initiate proper treatment.

45. Defendant Sage, who had actual knowledge of Decedent Scott's reported and demonstrated breathing difficulties, performed an incomplete respiratory/pulmonary examination at the time of and/or immediately prior to Decedent Scott's discharge from the health unit. Although Defendant Sage understood the need to test and document Decedent Scott's lungs as sounding "clear" prior to his discharge, she failed to assess and/or consider his work of breathing, quality of air movement, presence or absence of respiratory distress, or his mental status. Decedent Scott's vital signs also were not charted at the time of his discharge from the health unit.

46. Defendant Sage did not undertake medical efforts and/or conduct an examination to determine if Decedent Scott could safely be released from medical care. Defendant Sage also failed to refer Decedent Scott to a physician for purposes of examining Decedent Scott to determine if he could safely be released from medical care.

47. Given Decedent Scott's greatly diminished and incomplete PEFR, both when he arrived in the health unit and at the time that he was released from the unit, continuing medical monitoring/treatment was mandated under the applicable standard of care and controlling policy and procedure.

48. Moreover, in light of Decedent Scott's documented presentation with diaphoresis and hypoxia in conjunction with his continuing inability to complete requested PEFR testing,

Defendant Sage had actual knowledge that Decedent Scott was at risk for progressive asthma related symptoms, continuing medical illness, and the possibility of death.

49. Decedent Scott was suffering from an acute asthma attack at the time of his departure from the health unit and was accordingly at grave risk of further illness and the possibility of death.

50. Defendant Sage's treatment chart concerning Decedent Scott indicates that he would be "added to the MD chronic care list" thereby evidencing her actual knowledge of Decedent Scott's need for continuing medical care. Defendant Sage failed, however, to undertake the efforts necessary to have Decedent Scott identified on that day's patient list; failed to properly designate Decedent Scott for continuing healthcare, communicate to MCI-J staff that Decedent Scott required transport to a physician appointment, or act to have him transported for further medical treatment; and/or otherwise failed to provide the needed healthcare or ensure that the needed care was available.

51. Alternatively, Defendant Sage fully informed Defendant Wexford that Decedent Scott required evaluation and continuing treatment by a physician (as charted) on May 23, 2013. Despite this report and actual knowledge of Decedent Scott's need for continuing medical care, Defendant Wexford failed to undertake the efforts necessary to have Decedent Scott identified on that day's patient list; failed to properly designate Decedent Scott for continuing healthcare, communicate to MCI-J staff that Decedent Scott required transport to a physician appointment, or have him transported for further medical treatment; and/or otherwise failed to provide the needed healthcare or ensure that the needed care was available.

52. Defendant Sage and/or Defendant Wexford further failed to notify the DPSCS its agents, servants, and/or employees (i.e. the hierarchy at MCI-J) of Decedent Scott's ongoing breathing

difficulties at the time of his departure from the health unit, his need for continuing medical evaluation and treatment, or his need to be transported and/or permitted to see heath care providers for further evaluation and treatment. In the absence of such notifications, Decedent Scott was prevented from obtaining critical life saving medical care.

53. Decedent Scott was not followed by Defendant Sage and/or Defendant Wexford after the time of his departure from the health unit at 6:00 a.m. on May 23, 2013.

54. Defendant Sage and/or Defendant Wexford otherwise failed to ensure that needed medical care was available.

55. Decedent Scott was not seen by a physician or any healthcare providers other than Nurse Sage on May 23, 2013.

56. Decedent Scott's asthma attack progressed unabated due to the lack of continuing and necessary medical care.

57. On May 23, 2013, at approximately 9:45 p.m., Decedent Scott was observed "leaning on the top bunk" in his cell "having a hard time breathing." A medical emergency was called, CPR was initiated, and Decedent Scott was transported via ambulance to Baltimore Washington Medical Center. Decedent Scott was pronounced dead at 10:44 p.m. on May 23, 2013.

58. On May 24, 2013, an autopsy was performed by the Office of the Chief Medical Examiner. The corresponding protocol indicates that "Troy Anthony Scott, Jr. Died of Asthma. Autopsy revealed no signs of injury. The manner of death is NATURAL. Postmortem toxicology tests were negative for alcohol and drugs."

59. At all times relevant to this Complaint, Decedent Scott was incarcerated and without freedom, liberty, and any ability to obtain necessary medical attention by any health care

providers other than Defendant Sage and/or Defendant Wexford, its agents, servants, and/or employees.

60.  The worsening of Decedent Scott's condition and his death were readily preventable and would not have occurred if he received reasonable and necessary medical attention, and if Defendant Sage and/or Defendant Wexford had not been deliberately indifferent to his serious medical needs.

<u>COUNT I –NEGLIGENCE</u>
*(All Statutory Beneficiaries against Defendant
Raylene Sage, R.N.)*

61. Claimants incorporate by reference the allegations contained in paragraphs 1 through 60 as if fully restated herein.

62. Pursuant to MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §3-904, Pamela Scott and Troy Anthony Scott, Sr. are primary beneficiaries entitled to pursue an action under Maryland's "Wrongful Death Statute" against Defendant Sage.

63. Pursuant to MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §3-904, Plaintiff Latoya Moore, as the mother and next friend of K.S., a minor beneficiary, is entitled to pursue an action under Maryland's "Wrongful Death Statute" against Defendant Sage.

64. Pursuant to MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §3-904, Plaintiff Wyketa Burgess, as the mother and next friend of T.S., III and T.S., minor beneficiaries, is entitled to pursue an action under Maryland's "Wrongful Death Statute" against Defendant Sage.

65. Pursuant to MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §3-904, Plaintiff Che'Tara Bell, as the mother and next friend of U.S., a minor beneficiary, is

entitled to pursue an action under Maryland's  "Wrongful Death Statute" against Defendant Sage.

66. Defendant Sage deviated from the proper standard or care directly and through her actual and/or apparent agents, servants, and/or employees, by failing to act as reasonably competent like healthcare provider would have acted under the same or similar circumstances.

67. Defendant Sage was negligent, in among other things, failing to properly examine and assess Decedent Scott; failing to adequately diagnosis Decedent Scott's condition; failing to properly treat Decedent Scott; failing to maintain Decedent Scott under medical observation; failing to document and communicate Decedent Scott's need for continuing observation, evaluation and treatment; failing to allow Decedent Scott access to necessary treatment; failing to undertake reasonable and necessary efforts to ensure that Decedent Scott obtained critical and necessary medical attention; failing to undertake precautions required by the controlling standard of care and that reasonable health care providers would have undertaken to monitor, control, and/or prevent the medical condition which resulted in death; failing to comport with and/or act pursuant to the State of Maryland's policies and procedures applicable to asthmatic detainees including Decedent Scott; failing to undertake efforts necessary to verify that Decedent Scott would be indentified for transfer and/or allowed to attend a physician visit on May 23, 2013; failing to follow Decedent Scott's condition after knowingly discharging him from care with an ongoing asthma attack and documented "low" PEFR measurements; failing to intervene in a timely manner to prevent the worsening of Decedent Scott's condition and death; failing to verify that medical screenings and computerized medical records were reviewed by physicians to ensure that inmates including Decedent Scott received adequate health care; and failing to issue proper communications, orders, and/or directives to DPSCS's agents at MCI-J necessary to

prompt continuing medical care. Defendant Sage also committed other acts of negligence which are not expressly enumerated herein.

68. As a direct and proximate result of the negligence of healthcare provider Defendant Sage, Decedent Scott experienced conscious pain and suffering; a worsening of his condition; a withering of his physical person; and he ultimately died.

69. All of the injuries and damages sustained by Decedent Scott were the direct and proximate result of the negligent actions of Defendant Sage, without any act or omission on the part of Mr. Scott directly thereunto contributing.

70. Decedent Scott did not assume the risk of any of the injuries referenced herein and relied on the expertise of healthcare provider Defendant Sage.

71. As a direct and proximate result of Defendant Sage's negligent, reckless, and outrageous conduct, Plaintiffs Pamela Scott and Troy Anthony Scott, Sr.,  as the parents of Decedent Scott, suffered and sustained pecuniary loss; mental anguish; emotional pain and suffering; loss of monetary earnings, contributions and support; loss of services; loss of comfort; loss of solace; loss of society; loss of companionship; loss of protection; loss of filial care; loss of attention; loss of advice; loss of counsel; and loss of guidance and is entitled to recover such damages as a consequence of their son's tragic and untimely death.

72. That each of the minor plaintiffs indentified herein, through their respective mother and next friend, is entitled to recover damages for their father's tragic and untimely death. As a direct and proximate result of Defendant Sage's negligent, reckless, and outrageous conduct, the identified biological children of the deceased, suffered and sustained pecuniary loss; mental anguish; emotional pain and suffering; loss of monetary earnings, contributions and support; loss of services; loss of comfort; loss of solace; loss of society; loss of companionship; loss of

protection; loss of filial care; loss of attention; loss of advice; loss of counsel; and loss of

guidance and are entitled to recover such damages as a consequence of their father's tragic and

untimely death.

WHEREFORE, the Plaintiffs identified herein hereby requests that this Honorable Court:

(A)     Award the identified Plaintiffs actual, compensatory, and consequential damages

in an amount to be determined at trial against Defendant Raylene Sage, R.N.;

 (B) Award costs of this action to the Plaintiff; and

 (C) Award such other and further relief as this Court may deem just and appropriate.

COUNT II – LIABILTY UNDER 42 U.S.C. § 1983
FOR EIGHTH AMENDMENT VIOLATION
(*Plaintiff Estate of Troy Anthony Scott, Jr. against
Defendant Raylene Sage, R.N.*)

73. Plaintiff Estate of Troy Anthony Scott incorporates by reference the allegations contained

in paragraphs 1 through 72 as if fully restated herein.

74. Pursuant to MARYLAND ANNOTATED CODE, *Estates and Trusts Article* §7-401(y),

Plaintiff Pamela Scott is authorized to bring a survival action as the Personal Representative of

the Estate of Troy Anthony Scott, Jr.

75. The Eight Amendment of the United States Constitution prohibits "unnecessary and

wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. In

*Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976), the Supreme Court established that

deliberate indifference to serious medical needs of a convicted prisoner violates the Eight

Amendment's prohibition against cruel and unusual punishment and gives rise to a cause of

action under 42 U.S.C. § 1983.

76. When Decedent Scott presented to the health unit at MCI-J on May 23, 2013 and at the

time of his departure from the health unit at 6:00 a.m. on the same day, it was apparent that he

was suffering from an ongoing and serious medical condition necessitation continuing medical treatment. The record concerning Decedent Scott's encounter with Defendant Sage on May 23, 2013, demonstrates that Decedent Scott (1) reported a previous history of respiratory distress, (2) was diaphoretic and hypoxic at the time of his presentation, and (3) remained unable to complete requested PEFR testing. Moreover, according to Defendant Sage, the portion of PEFR measurements that were completed prior to Decedent Scott's discharge from the medical unit "remained low" following the administration of a nebulizer treatment.

77. The documented PEFR measurements and Decedent Scott's inability to complete requested PEFR testing were indicative of severe airway narrowing; the existence of an ongoing condition that reasonable nurses and/or healthcare providers in the same position as Defendant Sage would find important and worthy of comment or treatment; the presence of a medical condition that significantly affected Decedent Scott's daily activities; and the existence of an illness that might result in further illness, substantial pain, and death.

78. Decedent Scott's presentation in the health unit and the various findings charted by Defendant Sage compelled not only a referral for physician evaluation but also immediate transfer to an outside emergency room.

79. At the time of Decedent Scott's discharge from the health unit, Defendant Sage had actual knowledge of his continuing need for medical attention and understood that a failure to further treat his condition could result in significant injury, the unnecessary and wanton infliction of pain, and the possibility of death.

80. Defendant Sage nevertheless failed to provide additional necessary medical treatment; act to ensure that needed care that she identified (evaluation by a physician) was provided to and/or available to Decedent Scott; follow Decedent Scott's case after he was discharged from the

health unit; and/or communicate to DPSCS its agents, servants, and/or employees, and/or

Defendant Wexford, its agents, servants, and/or employees that Decedent Scott had departed the

health unit with  ongoing breathing difficulties as evidenced by his inability to complete PEFR

measurements and therefore should be subject to ongoing monitoring (medical and otherwise).

81. Defendant Sage's acts and omissions were inappropriate in light of the known risk to

Decedent Scott; were subjectively reckless; and were undertaken with deliberate indifference to

Decedent Scott's serious medical needs.

82. Defendant Sage's recklessness and deliberate indifference were manifested by, among

other things, her utter lack of response to Decedent Scott's ongoing breathing problems that she

personally observed and documented in his chart; her decision to discharge Decedent Scott from

the medical unit despite knowing that he could not perform PEFR testing; and her failure to

initiate and/or maintain efforts to have Decedent Scott added, identified, and/or designated on the

physician examination list for May 23, 2013. Defendant Sage also committed other reckless

actions that denied and/or delayed Decedent Scott's access to necessary medical treatment.

83. At all times relevant herein, Defendant Sage was acting under the color of State and local

law.

84. Defendant Sage's actions and omissions deprived Decedent Scott of his clearly established

and well-settled constitutional rights.

85. Plaintiff's Decedent suffered excruciating physical pain, emotional anguish, fear and

anxiety, psychological and emotional trauma, and ultimately suffered a tragic and untimely death

as a direct proximate result of Defendant Sage's constitutional deprivation.

86. Decedent Anthony Scott, Jr. did not consent to and/or contribute in the constitutional

violation described herein.

87. The Estate of Troy Anthony Scott, Jr. has also incurred damages in the form of ambulance bills, hospital bills, medical bills, funeral and burial costs, and estate administration expenses incurred.

WHEREFORE, the Plaintiff Pamela Scott on behalf of the Estate of Anthony Scott hereby requests that this Honorable Court:

(A)     Award actual, compensatory, and consequential damages in an amount to be determined at trial against Defendant Raylene Sage, R.N.;

(B) Award punitive damages in an amount to be determined at trial against Defendant Raylene Sage, R.N.;

(C) Award costs of this action to the Plaintiff;

(D) Award reasonable attorney's fees and costs incurred in pursuing this action, as provided under 42 U.S.C. §§ 1983 and 1988; and

(E) Award such other and further relief as this Court may deem just and appropriate.

## COUNT III– NEGLIGENCE
(*Statutory Beneficiaries against Wexford Health Services, Inc.*)

88.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 87 as if fully restated herein.

89. Pursuant to MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §3-904, Plaintiffs Pamela Scott and Troy Anthony Scott, Sr. are primary beneficiaries entitled to pursue an action under Maryland's "Wrongful Death Statute" against Defendant Wexford.

90. Pursuant to MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §3-904, Plaintiff Latoya Moore, as the mother and next friend of K.S., a minor beneficiary, is entitled to pursue an action under Maryland's "Wrongful Death Statute" against Defendant Wexford.

91. Pursuant to MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §3-904, Plaintiff Wyketa Burgess, as the mother and next friend of T.S., III and T.S., minor beneficiaries, is entitled to pursue an action under Maryland's "Wrongful Death Statute" against Defendant Wexford.

92. Pursuant to MARYLAND ANNOTATED CODE, *Courts & Judicial Proceedings Article* §3-904, Plaintiff Che'Tara Bell, as the mother and next friend of U.S., a minor beneficiary, is entitled to pursue an action under Maryland's "Wrongful Death Statute" against Defendant Wexford.

93. Defendant Wexford deviated from the proper standard of care directly and through its actual and/or apparent agents, servants, and/or employees including Raylene Sage, R.N., by failing to act as a reasonably competent like healthcare provider would have acted under the same or similar circumstances.

94. Defendant Wexford was negligent, in among other things, failing to properly train its agents, servant, and/or employees; failing to monitor its agents, servants, and/or employees; failing to properly supervise its agents, servants, and/or employees; failing to properly examine and assess Decedent Scott; failing to adequately diagnosis Decedent Scott's condition; failing to properly treat Decedent Scott; failing to maintain Decedent Scott under medical observation; failing to document and communicate Decedent Scott's need for continuing observation, evaluation, and treatment; failing to allow Decedent Scott access to necessary treatment; failing to undertake reasonable and necessary efforts to ensure that Decedent Scott obtained critical and necessary medical attention; failing to undertake precautions required by the controlling standard of care and that reasonable health care providers would have undertaken to monitor, control, and/or prevent the medical condition which resulted in death; failing to comport with and/or act

pursuant to the State of Maryland's policies and procedures applicable to asthmatic detainees including Decedent Scott; failing to ensure that its agents, servants, and/or employees comport with and/or acted pursuant to the State of Maryland's policies and procedures applicable to asthmatic detaining including Decedent Scott; failing to follow or enforce its own policies and/or procedures pertaining to the treatment of asthmatic inmates; failing to undertake efforts necessary to verify that Decedent Scott would be indentified for transfer and/or allowed to attend a physician visit on May 23, 2013; failing to follow Decedent Scott's condition after knowingly discharging him from care with an ongoing asthma attack and documented "low" PEFR measurements; failing to intervene in a timely manner to prevent the worsening of Decedent Scott's condition and death; failing to verify that medical screenings and computerized medical records were reviewed by its agents, servants, and/or employees to ensure that inmates including Decedent Scott received adequate health care; and failing to issue proper communications, orders, and/or directives to DPSCS's agents at MCI-J necessary to prompt continuing medical care. Defendant Wexford also committed other acts of negligence which are not expressly enumerated herein.

95. Defendant Wexford is also vicarious liable for the acts and omissions of its actual and apparent agents, servants, and/or employees, including  but not limited to Nurse Sage, who was responsible for providing care to Decedent Scott.

96. As a direct and proximate result of the negligence of Defendant Wexford, Decedent Scott experienced conscious pain and suffering; a worsening of his condition; a withering of his physical person; and he ultimately died.

97. All of the injuries and damages sustained by Decedent Scott were the direct and proximate result of the negligent actions of Defendant Wexford, without any act or omission on the part of Decedent Scott directly thereunto contributing.

98. Decedent Scott did not assume the risk of any of the injuries referenced herein and relied on the expertise of healthcare provider Defendant Wexford.

99. As a direct and proximate result of Defendant Wexford's negligent, reckless and outrageous conduct, Plaintiffs Pamela Scott and Troy Anthony Scott, Sr.,  as the parents of Decedent Scott, suffered and sustained pecuniary loss; mental anguish; emotional pain and suffering; loss of monetary earnings, contributions and support; loss of services; loss of comfort; loss of solace; loss of society; loss of companionship; loss of protection; loss of filial care; loss of attention; loss of advice; loss of counsel; and loss of guidance and are entitled to recover such damages as a consequence of their son's tragic and untimely death.

100.     That each of the minor plaintiffs indentified herein, through their respective mother and next friend, is entitled to recover damages for their father's tragic and untimely death. As a direct and proximate result of Defendant Wexford's negligent, reckless, and outrageous conduct, the identified biological children of the deceased, suffered and sustained pecuniary loss; mental anguish; emotional pain and suffering; loss of monetary earnings, contributions and support; loss of services; loss of comfort; loss of solace; loss of society; loss of companionship; loss of protection; loss of filial care; loss of attention; loss of advice; loss of counsel; and loss of guidance and are entitled to recover such damages as a consequence of their father's tragic and untimely death.

WHEREFORE, the Plaintiffs identified herein hereby requests that this Honorable Court:

(A)     Award the identified Plaintiffs actual, compensatory, and consequential damages in an amount to be determined at trial against Defendant Wexford Health Services, Inc.;

(B) Award costs of this action to the Plaintiff; and

(C) Award such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,
IAMELE & IAMELE LLP

_____-s-_____
Anton L. Iamele, Federal Bar No. 14845
201 North Charles Street, Suite 400
Baltimore, Maryland 21201-4111
410-779-6160 (Telephone)
410-779-6161 (Facsimile)
aiamele@iamelelaw.com
*Attorney for Claimants*

## PRAYER FOR JURY TRIAL

Plaintiffs hereby request that all issues raised in this Complaint be decided by way of a jury trial.

_____-s-_____
Anton L. Iamele